**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| MARIEL CASTELLON, *on behalf of herself and all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>NEWREZ, LLC d/b/a SHELLPOINT MORTGAGE SERVICING, and GULF HARBOUR INVESTMENTS CORPORATION,<br><br>Defendants. | Civil Action No. 1:25-cv-01917 |

## CLASS ACTION COMPLAINT

Plaintiff Mariel Castellon ("Plaintiff"), *individually and on behalf of all others similarly situated*, through counsel, files this Class Action Complaint against Newrez, LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint") and Gulf Harbour Investments Corporation ("Gulf Harbour") and alleges as follows:

## BACKGROUND

1. This case concerns a scheme by Shellpoint, its predecessor-in-interest Specialized Loan Servicing, LLC ("SLS"), and the owners of the disputed debts, including Gulf Harbour, to falsely represent to borrowers like Plaintiff that they owe thousands (in Plaintiff's case, approximately $200,000) in interest on their loans when the prior servicer of the loan had affirmatively represented that no interest was accruing and waived any right to collect the inflated amounts years before Defendants' fraudulent scheme. Despite these affirmative representations, Defendants retroactively assessed interest on Plaintiff's loan resulting in her paying close to

$100,000 in retroactively assessed interest.

2. In the lead up to the Great Recession, mortgage lenders targeted prospective homebuyers by offering loans that required no downpayment. These lending arrangements typically involved two loans: a primary mortgage that covered approximately 80 percent of the home's appraised value; and a second "piggyback" mortgage that operated as a functional downpayment to cover the remaining sales price. By design, the second mortgage overextended borrowers, resulting in the mass foreclosures that caused the Great Recession.[1]

3. Plaintiff purchased a home using this 80/20 mortgage arrangement in 2005. At that time, her second mortgage had a principal balance of $122,000.00.

4. During the Great Recession, Plaintiff fell behind on her second mortgage, and the then-servicer of her loan, Ocwen, accelerated and charged off the loan on behalf of the creditor. As is customary in the mortgage industry, Ocwen and the prior owner of the loan set the interest rate of the loan at 0%. Indeed, Ocwen sent multiple mortgage statements to Plaintiff affirmatively representing that the interest rate on the loan was now 0%.

5. Following the charge off of Plaintiff's loan, SLS became the loan's servicer. SLS is the predecessor-in-interest to Shellpoint through a merger-by-acquisition completed last year.[2]

---

[1] The Consumer Financial Protection Bureau describes "80/20" loans as a type of "piggyback mortgage product" that "involved a first lien loan for 80% of the value of the home and a second lien loan for the remaining 20% of the home's valuation." *See* CONSUMER FIN. PROT. BUREAU, *CFPB Issues Guidance to Protect Homeowners from Illegal Collection Tactics on Zombie Mortgages*, https://www.consumerfinance.gov/about-us/newsroom/cfpb-issues-guidance-to-protect-homeowners-from-illegal-collection-tactics-on-zombie-mortgages (last visited Feb. 1, 2024).

[2] *Rithm Capital to Acquire Specialized Loan Servicing LLC*, Businesswire (Oct. 2, 2023), https://www.businesswire.com/news/home/20231001340340/en/Rithm-Capital-to-Acquire-Specialized-Loan-Servicing-LLC.

Then, around 2019, Gulf Harbour acquired Plaintiff's second mortgage, likely for pennies on the dollar.

6. Eventually, Plaintiff fell on hard times and, in 2021, declared bankruptcy. During this bankruptcy, SLS filed a proof of claim asserting that Plaintiff owed only $10,897.98 in interest on her second mortgage, which had a principal balance at the time of $115,747.75. This was consistent with the loan having 0% interest for the years following Ocwen's charge off of the loan.

7. Then, only two years later, SLS filed a proof of claim in Plaintiff's 2023 bankruptcy, this time claiming that Plaintiff owed $142,680.98 in interest, for a total amount due of $258,543.73. But this interest was all for periods after which Ocwen and the prior owner of the loan had charged off the debt and set the interest rate to 0%.

8. Defendants then continued to send correspondence to Plaintiff claiming that she owed tens of thousands in additional interest, eventually representing that she owed approximately $200,000 in interest, alone, and more than $300,000 in total.

9. This about face by SLS was no accident. SLS developed a scheme whereby it retroactively assessed interest on charged off loans, even for periods when the interest had been waived either through the failure to send monthly statements or, as in this case, when the prior servicer and owner of the loan had affirmatively set the rate at 0% because the loan was charged off.

10. Through this scheme, SLS and its coconspirators, including Gulf Harbour and Shellpoint, knowingly inflate the balances of Plaintiff's and other borrowers' second mortgage loans to include interest that was otherwise not accruing, all so that they could extract tens to hundreds of thousands of dollars from Plaintiffs and other borrowers—either through foreclosure sales, loan modifications, or cash payments.

11. SLS's scheme to collect retroactive assessment of interest was conveniently timed with the rise in home prices following the COVID-19 pandemic, which caused the available equity in homes to skyrocket and thus rendered collectable through foreclosure the thousands in additional equity that SLS now claimed was owed.

12. SLS's systems assessed retroactive interest on loans and attempted to and collected the unlawful amounts through interstate mails and wires. Shellpoint was also aware of the same issue at the time it merged with SLS but affirmatively chose to continue the scheme of collecting retroactive interest as it substantially increased the profits of SLS and its business partners, including investors such as Gulf Harbour.

13. Plaintiff fell victim to Defendants' fraudulent scheme. Now, following the foreclosure of Plaintiff's first mortgage in April 2024, Gulf Harbour has moved the Fairfax County Circuit Court for disbursement of over $280,000 on Plaintiff's second mortgage, which would come from the surplus funds that are otherwise owed to Plaintiff. The surplus sought by Gulf Harbour includes $172,680.54 in retroactive interest that it claims accrued between October 2008 and April 2024, ignoring the years in which the interest rate was set to 0%. This is money that the Plaintiff desperately needs to provide stable housing for her young children.

14. But Plaintiff does not owe the amounts that Defendants claim, and their attempts to collect and collection of these inflated amounts from Plaintiff and thousands of other similarly situated consumers constitutes violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and the Virginia Consumer Protection Act ("VCPA"), as well as declaratory relief.

15. Plaintiff also brings an individual claim under the Real Estate Settlement Procedures Act ("RESPA") for Shellpoint's failure to properly investigate and respond to her Qualified Written Request that identified and asked Shellpoint to correct its unlawful conduct.

## JURISDICTION AND VENUE

16. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367. Additionally, the Court also has subject matter jurisdiction over Plaintiff's VCPA claim under 28 U.S.C. § 1332(d) because Plaintiff and putative class members (Virginia) and Defendants (South Carolina, Florida and Delaware) are each citizens of different states and the amount in controversy exceeds $5,000,000 exclusive of interest and costs. Under 28 U.S.C. § 1332(d)(6), "the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000." The test for determining whether the amount in controversy is "the pecuniary result to either party which [a] judgment would produce." *Dixon v. Edwards,* 290 F.3d 699, 710 (4th Cir. 2002) (quoting *Gov't Employees Ins. Co. v. Lally,* F.2d 568, 569 (4th Cir.1964)). Statutory damages "are properly includable in the calculation of the jurisdictional amount," including increased damages for willful violations. *See Bartnikowski v. NVR, Inc.*, 307 F. App'x 730, 735 (4th Cir. 2009). Attorney's fees may also be included in the amount in controversy when recoverable under the asserted statute. *Missouri State Life Ins. Co. v. Jones,* 290 U.S. 199, 202 (1933) (holding that where a state statute provides for the award of attorney's fees, those fees can be considered as part of the amount in controversy).

17. Here, Plaintiff's VCPA claim includes hundreds—if not thousands—of Virginia homeowners, each of whom is entitled to damages for the amount of retractive interest assessed by Defendants under their deceptive scheme. In Plaintiff's case, alone, the amount of retroactive interest is approximately $200,000. Extrapolated to the entire VCPA class, the amount in controversy would exceed $5 million with only 25 class members. Upon information and belief, there are at least 100 members of the putative class under Plaintiff's VCPA claim, and the amount of retroactive interest for each class member far exceeds $5 million in the aggregate. This is before

considering the attorney's fees and costs to which Plaintiff and the class would be entitled under the VCPA, as well as treble damages for Defendants' willful conduct, as alleged below. Va. Code § 59.1-204.

18. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the acts and transactions that establish this Complaint occurred in this District and Division, where Plaintiff resides and subject property is located.

## PARTIES

19. Plaintiff Mariel Castellon is a natural person residing in this District and Division.

20. Defendant Newrez, LLC d/b/a Shellpoint is a limited liability company organized under the laws of Delaware with its principal place of business in Greenville, South Carolina. Shellpoint is the successor-in-interest to SLS by virtue of the acquisition of SLS by Shellpoint's parent company, Rithm Capital, and the merger of SLS with Shellpoint, effective May 1, 2024.

21. Defendant Gulf Harbour Investments Corporation is a corporation with its principal place of business in Florida.

22. Shellpoint is a mortgage loan servicing company governed by RESPA.

23. Shellpoint and Gulf Harbour are each a supplier as defined by the VCPA because they advertise, solicit, and engage in consumer transactions, namely: the servicing and collection of discharged residential mortgage debts.

## FACTS

### *Zombie Second Mortgages and Defendants' Deceptive Scheme*

24. This case arises from the recent wave of attempts to collect "zombie" second mortgages, which were largely originated before the foreclosure crisis of 2008.

25. Many consumers during the foreclosure crisis filed for bankruptcy, which eliminated their personal liability for paying their second mortgage. The lien on their home remained, however, meaning that if they did not continue paying their mortgage, the lender could foreclose on their home.

26. While housing prices recovered from the Great Recession, many second mortgage lenders and servicers could not collect on the loans due to the limited equity in the borrowers' homes. They therefore charged them off on their internal accounting books, deeming them uncollectable. As part of the charge off, the creditors/servicers set the loans to 0% interest, as in Plaintiff's case.

27. After charge off, these second mortgages remained dormant for a decade or more, with no efforts by servicers or creditors to collect them, but the liens remained. During this time, the defaulted debts were often sold, as with Plaintiff's loans, typically for pennies on the dollar (as the loans were deemed uncollectable).

28. SLS was the largest servicer of these loans and, together with the investors with whom it had entered servicing contracts, purchased these defaulted debts.

29. When SLS and its investor partners onboarded these dormant debts, it received records stating that the loans had a 0% interest rate, often for years prior to SLS acquiring the servicing rights.

30. Recognizing these loans were uncollectible, SLS itself treated them as dormant debts, categorized them as charge offs and had them serviced by the "recovery" department, which is assigned only defaulted debts that are unlikely to be collected on.

31. Then, as housing prices skyrocketed following the COVID-19 economic recovery efforts, the long-dormant second mortgage debts became collectible, as the available equity borrowers had accrued in the intervening decade exceeded the value of their first-lien mortgages.

32. With the rise in home prices, SLS and other second mortgage servicers and lenders started to ramp up their collection efforts, reviving the long-dormant debts (hence the moniker "Zombie Seconds") and reversed the charge offs so it could attempt to collect the amounts owed on the loans.

33. Not content to simply collect what was actually owed on the dormant second mortgages, however, SLS and its investor partners engaged in a scheme that retroactively applied interest for periods that it knew the loans had been set to 0% interest by the prior servicer/owner of the loans.

34. The retroactive assessment of interest added tens and often hundreds of thousands of dollars to the outstanding balances of the loans—despite that prior owners and servicers expressly disclaimed these interest amounts—while borrowers had no opportunity to avoid the supposed accumulation of interest on their loans.

35. SLS had an incentive to retroactively assess interest, as upon information and belief, the servicing agreements it entered with Gulf Harbour and other investors with whom it partnered provided SLS with a share of the recovery on the loans when they were charged off. By increasing the balance of the loans, therefore, SLS increased its share of the recovery. And the investors had no issue collecting additional amounts, either, as it lined their pockets as well.

36. To carry out this fraudulent scheme, SLS and later Shellpoint sent correspondence through the mails and wires of the United States that falsely claimed that second mortgage

borrowers owed tens and hundreds of thousands of dollars in retroactive interest, when they knew that most of that interest had been waived.

37. SLS and Shellpoint also worked with investors like Gulf Harbour, with whom it had contractual relationships that permitted SLS and Shellpoint to assign the defaulted debts to Gulf Harbour and the other investors as nominal owners, in hopes of shielding SLS and Shellpoint from the liability they might face as creditors of the loans under the Truth in Lending Act and other statutes.

38. Gulf Harbour and the other investors who purchased these defaulted debts knew that SLS and Shellpoint were collecting thousands in additional interest and actively participated in the scheme by refunding SLS's and Shellpoint's costs of sending out monthly statements, foreclosure notices, and other correspondences, as well as communications through interstate wires, to borrowers of the loans—as well as filings in courts of law—that falsely stated the amounts that were owed.

39. Upon information and belief, Gulf Harbour and the other investors who acquired the defaulted debts worked together and with SLS/Shellpoint to carry out this scheme, including by: (1) spreading SLS's and Shellpoint's costs out among each other; (2) spreading the risks of the scheme among each other and SLS/Shellpoint; (3) concealing the scheme from the public; (4) sharing in the profits of the scheme; and (5) sharing and communicating advice and knowledge of the best methods for avoiding detection and liability for falsely stating the amounts owed on the zombie debts.

40. Together, Gulf Harbour, the other investors who purchased the dormant debts, SLS, and Shellpoint formed an association-in-fact enterprise comprising each of them, as well as the

individual officers and higher ups at each entity who condoned, coordinated, funded, and sanctioned the fraudulent scheme.

41. Alternatively, Shellpoint and SLS formed association-in-fact enterprises with each of the separate investors, including Gulf Harbor, comprising each entity, as well as the individual officers and higher ups at each entity who condoned, coordinated, funded, and sanctioned the fraudulent scheme.

***Plaintiff's Experience***

42. Plaintiff's experience illustrates the blatant deception of Defendants' scheme.

43. In 2005, Plaintiff purchased a home for herself and her two children in Vienna, Virginia. Plaintiff used the home as her primary residence during the relevant period.

44. As with many borrowers at the time, Plaintiff used an 80/20 mortgage structure to finance her home purchase, with a primary mortgage to cover approximately 80 percent of the home's appraised value, and a second mortgage to cover the remaining 20 percent of the home's value.

45. Plaintiff's second mortgage had an initial principal balance of $122,000.00, with a fixed rate of 9.625% interest.

46. During the height of the Great Recession, Plaintiff fell behind on her second mortgage.

47. Following this default in approximately 2008, the then-servicer of the loan, Ocwen, acting on behalf of the then-owner of the debt, charged off the loan from its accounting books and set the interest rate of the loan to 0%.

48. Until the end of 2014, Ocwen sent several monthly statements to Plaintiff confirming that the loan had set to a 0% interest rate, with the then principal balance of $116,425.75 being all that Ocwen claimed was due.

49. In total, the second mortgage loan had a 0% interest rate until at least December of 2014 when Ocwen remained the servicer of the loan.

50. SLS became the servicer of Plaintiff's second mortgage following Plaintiff's default and Ocwen's charging off of her loan. Gulf Harbour then acquired the loan in 2019.

51. Upon information and belief, at the time SLS onboarded Plaintiff's loan, Ocwen's records provided to SLS showed that the loan had a 0% interest rate.

52. Plaintiff obtained a Chapter 7 discharge of her second mortgage in April 2020.

53. Due to ongoing financial hardship, Plaintiff filed for bankruptcy in 2021. In that bankruptcy, SLS filed a proof of claim claiming that she owed only $115,747.75 in principal and only $10,897.98 in interest, or $126,645.73 in total, which confirmed that SLS had onboarded the loan with a 0% interest rate, or else the accrued interest would be far higher.

54. After Plaintiff continued to experience financial difficulties, she filed for bankruptcy again in 2023.

55. In this bankruptcy, SLS filed another proof of claim, this time asserting that Plaintiff now owed $142,680.98 in interest, for a total outstanding balance of $258,543.73.

56. In other words, in just two years, SLS went from claiming Plaintiff owed only $10,000 in interest to over $140,000.

57. Following her 2023 bankruptcy, Plaintiff continued to struggle financially and eventually defaulted on her primary mortgage, which was referred to foreclosure.

58. As a single mother dealing with other personal issues, Plaintiff was unable to avoid foreclosure, and her home was sold at auction in April 2024.

59. Following the foreclosure, Gulf Harbour and SLS/Shellpoint attempted to collect the over $250,000 they claimed was due on the second mortgage, but Gulf Harbour could not produce the original note to the foreclosure trustee. Because of this, the foreclosure trustee refused to provide the surplus from the sale to Gulf Harbour.

60. Instead, in October 2024, the foreclosure trustee filed a petition in the Fairfax County Circuit Court seeking to interplead $286,756.99 from the surplus of the foreclosure sale to the Court. Gulf Harbour has sought payment of the entire amount, including over $170,000 in interest allegedly accrued between October 2008 and April 2024 (*i.e.*, the period encompassing the minimum six years when Ocwen had set the loan to 0%).

61. But Plaintiff did not owe the $170,000 in interest that Defendants claimed were owed on Plaintiff's second mortgage. Indeed, only three years earlier, SLS on behalf of Gulf Harbour conceded that at most she owed only $10,000 in interest, yet somehow that amount had increased ***by 17 times*** since that date.

62. In response to this attempt to collect nearly $300,000 from her, Plaintiff sent a Qualified Written Request to Shellpoint in June 2025.

63. Plaintiff's Qualified Written Request was sent to the address that Shellpoint had designated for these types of correspondence, and Shellpoint received it.

64. Plaintiff's Qualified Written Request, which contained information sufficient to identify her loan, noted that Ocwen had set her interest rate to 0% for at least six years that Shellpoint and Gulf Harbour were now claiming she owed thousands in additional interest. She

specifically asked Shellpoint to remove this undue interest. Plaintiff also asked Shellpoint to remove any interest for periods in which no monthly statements were sent.

65. Plaintiff's QWR also asked Shellpoint to investigate and explain how it calculated the interest on her loan, and it asked Shellpoint to provide her with a copy of her servicing notes, the loan boarding information from Ocwen, the identity of the owner of her loan, and the months Shellpoint agrees it did not send monthly statements.

66. Shellpoint did not respond to Plaintiff's QWR. Because it failed to respond, Shellpoint/SLS did not send Plaintiff her servicing notes or the other information she requested, and it failed to correct the improper interest assessed against her.

67. Plaintiff has suffered significant emotional distress from the threatened theft of in the significant equity from the home where she raised two daughers and Shellpoint's refusal to correct its conduct. With no remedy provided by Shellpoint or Gulf Harbour, she is now forced to bring this case seeking relief under RICO, the VCPA, the Declaratory Judgment Act, and RESPA.

**COUNT ONE:**
**Violations of RICO, 18 U.S.C. § 1962(d)**
**(Class Claim against All Defendants)**

68. Plaintiff incorporates the preceding allegations as if fully set forth herein.

69. Under Federal Rule of Civil Procedure 23, Plaintiff brings this count on behalf of herself and the following class of which she is a member (the "RICO Class"):

> All consumers: (1) with an open- or closed-end mortgage serviced by SLS prior to SLS's merger with Shellpoint, (2) which SLS's and/or Shellpoint's records indicate at the time of onboarding of the loan had an interest rate of 0%; (3) and to whom SLS and/or Shellpoint transmitted or mailed correspondence within the past four years that claimed interest was owed for periods in which the interest rate was set at 0%.

70. Plaintiff also brings this claim on behalf of herself and the following subclass, of which she is a member (the "Gulf Harbour Subclass"):

> All consumers: (1) with an open- or closed-end mortgage owned by Gulf Harbour and serviced by SLS prior to SLS's merger with Shellpoint, (2) which SLS's and/or Shellpoint's records indicate at the time of onboarding of the loan had an interest rate of 0%; (3) and to whom SLS and/or Shellpoint transmitted or mailed correspondence within the past four years that claimed interest was owed for periods in which the interest rate was set at 0%.

71. **<u>Numerosity</u>. Fed. R. Civ. P 23(a)(1).** The class members are so numerous that joinder of all is impractical. Upon information and belief, SLS serviced thousands of mortgage loans and subjected all of them to the same procedures. The class members' names and addresses are identifiable through SLS's and Shellpoint's internal business records, and they may be notified of this litigation by published or mailed notice.

72. **<u>Predominance of Common Questions of Law and Fact</u>. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants were associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce; (2) whether Defendants participated directly or indirectly in the conduct of such enterprise through a pattern of racketeering activity; (3) whether Defendants conspired to violate the above prohibitions; and (4) the appropriate amount of damages.

73. **<u>Typicality</u>. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. Plaintiff is also entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

74. **<u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4)**. Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the class members that she seeks to represent. Plaintiff have retained counsel competent and experienced in class-action litigation, including against SLS and Shellpoint, and

she intends to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the putative class members' interests. Neither Plaintiff nor her counsel have any interests that might cause them to not vigorously pursue this action.

75. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be almost impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the courts. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by SLS's and Shellpoint's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

76. Shellpoint, SLS, Gulf Harbour, and the other investors in the mortgage debts issued to the RICO Class, as well as the individuals at each entity who knowingly approved of and furthered the scheme, constitute an association-in-fact enterprise who are associated together for the common purpose of engaging in the use of the mails and wires to further a fraudulent scheme and artifice through the intentional inflation of the outstanding balances of Plaintiff's and the class member's loans (hereinafter, the "Enterprise").

77. Specifically, Shellpoint, Gulf Harbor, SLS, and the yet-to-be-identified coconspirators and investors are each separate legal entities and individuals who formed together

for the collective purpose of purchasing defaulted second mortgage debts that had been charged off by the prior servicer and, through a systematic process, used the interstate mails and wires to attempt to collect and collect from the putative class members millions in additional interest that they knew had been waived by the prior servicer and owner of the debt.

78. Shellpoint/SLS provided the mechanisms to conduct the affairs of the enterprise by sending correspondence demanding payment of retroactive interest and fees that were not owed, while Gulf Harbour and the other investors provided the funding for Shellpoint/SLS's conduct, and all parties to the enterprise shared in the collective benefit of the enterprise by reaping millions in additional interest on second mortgage debts.

79. Alternatively, SLS, Shellpoint, and Gulf Harbour, as well as the yet-to-be-identified individuals at each entity who approved of and furthered the fraudulent scheme, formed an association-in-fact enterprise with respect to the loans issued to the Gulf Harbour Subclass and are liable to the Subclass under this Count and Count Two (hereinafter, the "Gulf Harbour Enterprise").

80. The members of the Enterprise and Gulf Harbour Enterprise knew that the objective of the enterprise was unlawful, as they knew from their own internal business records that the subject loans had been onboarded by SLS with a 0% interest rate, and they nonetheless chose to send correspondence through the mail to Plaintiff and others attempting to collect and collecting tens and hundreds of thousands in additional interest that they knew was not owed. Defendants intentionally concealed their knowledge of their deceit from Plaintiff, the class members, and others, including courts of law, to financially benefit off the backs of unsuspecting consumers.

81. Shellpoint, SLS, Gulf Harbour, and the other investors and individuals to be identified through discovery are associated-in-fact both through the shared purpose of the

Enterprise, in which they all benefitted, as well as the contractual relationships between them, which furthered their shared interests and the objectives of the Enterprise by, among other things, establishing a profit sharing mechanism that incentivized the continued collection of inflated balances despite Defendants' knowledge of the falsity of their claims.

82. Upon information and belief, Gulf Harbour and the other investors who acquired the defaulted debts worked together with each other and SLS/Shellpoint to carry out this scheme, including by: (1) spreading SLS's and Shellpoint's costs out among each other; (2) spreading the risks of the scheme among each other and SLS/Shellpoint; (3) concealing the scheme from the public; (4) sharing in the profits of the scheme; and (5) sharing and communicating advice and knowledge of the best methods for avoiding detection and liability for falsely stating the amounts owed on the zombie debts.

83. Defendants conspired to participate in the conduct of the Enterprise through a pattern of racketeering activity, namely: the depositing, sending, and transmission in the interstate mail and wires of multiple correspondences, monthly statements, and notices to Plaintiff and the putative class members, as well as electronic mails and phone calls, to further a scheme or artifice to defraud those consumers into paying interest on their mortgage loans that they did not owe.

84. With respect to Plaintiff, for example, Defendants conspired to send and sent to her multiple correspondences that falsely stated the interest and total amount owed on her second mortgage, including but not limited to:

a. A July 2024 mortgage statement claiming she owed $292,524.14, including $176,776.39 in interest;

b. A September 2024 mortgage statement claiming she owed $293,678.90, including $177,931.15 in interest;

c. An October 2024 letter stating that Plaintiff was in default and needed to pay at least $199,497.08 to cure the default, including interest for periods in which the rate had been set to 0%;

d. Mortgage statements from October 2024 to the present which continued to claim that she owed more than $180,000 in interest and over $300,000 in total on her second mortgage;

e. The petition filed by Gulf Harbour in October 2024 in Fairfax County Circuit Court, which was served on Plaintiff through the mail, claiming that she owed over $286,000 and more than $170,000 in interest on her second mortgage to which it was entitled from the surplus of the foreclosure sale.

85. Defendants have sent multiple similar correspondences to each of the putative class members claiming that they owed interest for periods in which the loans were set to 0% interest.

86. The representations as to the amounts owed by Plaintiff and the class members were false, as they explicitly included interest for periods in which the prior servicer and owner of the debt had set the interest rate to 0%, meaning such interest was expressly waived and could not be collected by Defendants after the fact.

87. Despite their knowledge of the interest rate of the loans prior to onboarding, Defendants intentionally sent correspondence in the mail and transmitted writings and audio through interstate wires to Plaintiff and the class that claimed outstanding interest for the periods prior to SLS's acquisition of the servicing rights to the loan. They did so for their own pecuniary gain in furtherance of the objective of the Enterprise to defraud consumers into paying more than they owed on their loans.

88. Defendants thus engaged in mail and wire fraud, as defined by 18 U.S.C. §§ 1341 and 1343, in that they knowingly participated in a scheme to defraud Plaintiff and the class and used the mails and wires to execute such a scheme. *See United States v. Gillion*, 704 F.3d 284, 294 (4th Cir. 2012); *United States v. Jefferson*, 674 F.3d 332, 366 (4th Cir. 2012); *United States v. Mandel*, 591 F.2d 1347, 1361 (4th Cir. 1979).

89. Defendants engaged in a pattern of racketeering activity by participating in at least two acts that independently constitute mail and/or wire fraud within the last 10 years, including the multiple correspondences sent to Plaintiff, alone, in furtherance of their scheme to defraud consumers.

90. Defendants violated § 1962(d) of RICO by agreeing to undertake and advance the Enterprise, including by aiding, abetting, and facilitating the scheme through the knowing assessment of interest for periods in which the prior servicer and owner of the loan had set the interest rate to 0%.

91. Plaintiff and the classes have been harmed by Defendants' violations of § 1962(d), including through the lost equity in their homes.

92. Accordingly, Defendants are jointly and severally liable to Plaintiff and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT TWO:**
**Violations of RICO, 18 U.S.C. § 1962(c)**
**(Class Claim against All Defendants)**

93. Plaintiff incorporates the preceding allegations as if fully set forth herein.

94. Under Federal Rule of Civil Procedure 23, Plaintiff brings this count on behalf of herself and the same classes as Count One.

95. **<u>Numerosity</u>. Fed. R. Civ. P 23(a)(1).** The class members are so numerous that joinder of all is impractical. Upon information and belief, SLS serviced thousands of mortgage loans and subjected all of them to the same procedures. The class members' names and addresses are identifiable through SLS's and Shellpoint's internal business records, and they may be notified of this litigation by published or mailed notice.

96. **<u>Predominance of Common Questions of Law and Fact</u>. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants were associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce; (2) whether Defendants participated directly or indirectly in the conduct of such enterprise through a pattern of racketeering activity; and (3) the appropriate amount of damages.

97. **<u>Typicality</u>. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. Plaintiff is also entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

98. **<u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4)**. Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the class members that she seeks to represent. Plaintiff have retained counsel competent and experienced in class-action litigation, including against SLS and Shellpoint, and she intends to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the putative class members' interests. Neither Plaintiff nor her counsel have any interests that might cause them to not vigorously pursue this action.

99. **<u>Superiority</u>. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be almost impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the courts. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by SLS's and Shellpoint's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

100. As alleged above, Shellpoint, Gulf Harbour, SLS, the other investors in the subject loans, and the individuals who approved of and carried out the scheme constitute an association-in-fact enterprise who are associated together for the common purpose of engaging in the use of the mails and wires to further a fraudulent scheme and artifice through the intentional inflation of the outstanding balances of Plaintiff's and the class member's loans.

101. As alleged above, Defendants each participated in the operation of the Enterprise and/or the Gulf Harbour Enterprise, which existed for the purpose of furthering the fraudulent scheme, including through the mailing and wiring of communications and correspondences designed to induce and obtain the benefit of payments on amounts that Plaintiff and the putative class members did not owe.

102. Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c), including through the lost equity in their homes.

103. Accordingly, Defendants are jointly and severally liable to Plaintiff and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT THREE:**
**Violations of VCPA, Va. Code § 59.1-200**
**(Class Claim against All Defendants)**

104. Plaintiff incorporates the preceding allegations as if fully set forth herein.

105. Under Federal Rule of Civil Procedure 23, Plaintiff brings this count on behalf of herself and the following class of which she is a member against Defendant Shellpoint (the "VCPA Class"):

> All consumers in Virginia: (1) with an open- or closed-end mortgage loan serviced by SLS prior to SLS's merger with Shellpoint, (2) that was discharged in bankruptcy and is secured against the borrower's principal residence; (3) which SLS's and/or Shellpoint's records indicate at the time of onboarding of the loan had an interest rate of 0%; (4) and to whom SLS and/or Shellpoint sent communications within the past two years that claimed interest was owed for periods in which the interest rate was set at 0%.

106. Under Federal Rule of Civil Procedure 23, Plaintiff brings this count on behalf of herself and the following subclass of which she is a member and against all Defendants (the "Gulf Harbour VCPA Subclass"):

> All consumers in Virginia: (1) with an open- or closed-end mortgage loan owned by Gulf Harbour and serviced by SLS prior to SLS's merger with Shellpoint, (2) that was discharged in bankruptcy and is secured against the borrower's principal residence; (3) which SLS's and/or Shellpoint's records indicate at the time of onboarding of the loan had an interest rate of 0%; (4) and to whom SLS and/or Shellpoint sent communications within the past two years that claimed interest was owed for periods in which the interest rate was set at 0%.

107. **<u>Numerosity</u>. Fed. R. Civ. P 23(a)(1).** The class members are so numerous that joinder of all is impractical. Upon information and belief, SLS serviced thousands of mortgage loans and subjected all of them to the same procedures. The class members' names and addresses are identifiable through SLS's and Shellpoint's internal business records, and they may be notified of this litigation by published or mailed notice.

108. **<u>Predominance of Common Questions of Law and Fact</u>. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants are suppliers under the VCPA; (2) whether the subject loans are covered by the VCPA; (3) whether Defendants engaged in a practice prohibited by Va. Code § 59.1-200 in connection with the consumer transactions with Plaintiff and the class members; (4) whether Defendants' violations were willful; and (5) the appropriate amount of damages, including treble damages, to award.

109. **<u>Typicality</u>. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. Plaintiff is also entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

110. **<u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4)**. Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the class members that she seeks to represent. Plaintiff have retained counsel competent and experienced in class-action litigation, including against SLS and Shellpoint, and she intends to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and

adequately protect the putative class members' interests. Neither Plaintiff nor her counsel have any interests that might cause them to not vigorously pursue this action.

111. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be almost impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the courts. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by SLS's and Shellpoint's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

112. Defendants engaged in consumer transactions with Plaintiff and the putative class members, namely: the servicing and collection of residential mortgage debts.

113. Neither Shellpoint nor Gulf Harbour are mortgage lenders within the meaning of the VCPA's exemptions, because they do not "directly or indirectly originate or make a mortgage loan." *See* Va. Code § 59.1-199(4) (citing definition of "mortgage lender" under Va. Code § 6.2-1600). Shellpoint is a mortgage servicer, and Gulf Harbour purchases defaulted mortgage debts; it does not originate its own loans.

114. Nor is collection of the class members' debts by Defendants regulated by the Federal Consumer Credit Protection Act, 15 U.S.C. § 1601 et seq., because the debts were discharged in bankruptcy.

115. In connection with the consumer transactions involving Plaintiff and the putative class members, Defendants committed acts prohibited by Va. Code § 59.1-200, including, at a minimum, "using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code § 59.1-200(14).

116. "The VCPA creates a new, statutory cause of action distinct from and in addition to common law fraud." *Ballagh v. Fauber Enters.*, 290 Va. 120, 124 (2015) (citing *Owens v. DRS Auto. Fantomworks, Inc.,* 288 Va. 489, 497, 764 S.E.2d 256, 260 (2014) ("[T]he legislative purpose underlying the VCPA was, in large part, to expand the remedies afforded to consumers and to relax the restrictions imposed upon them by the common law.... Therefore, [it] extends considerably beyond fraud.")). The elements "of the two claims are [therefore] different." *Id.* With respect to misrepresentations under the VCPA, a plaintiff need only show (1) reliance and (2) damages. *In re Lumber Liquidators Litig.*, No. 1:16-md-2743, 2017 WL 29111681, at *12-13 (E.D. Va. July 7, 2017) (Trenga, J.). There is no requirement that the plaintiff establish the defendant's knowledge of the falsity or an intent to deceive, though the plaintiff may seek damages for willful violations. *See id.*

117. Here, Plaintiff and the putative class members relied on the representation that they were required to pay the retroactive interest and fees in deciding their debt mitigation options, including the potential avoidance of foreclosure, as well as any payments made by the class members on the inflated amounts. They also relied on the representation that the fees covered the actual costs to Defendants of providing the described services.

118. Plaintiffs and the putative class members have been damaged by Defendants' misrepresentations, including through lost equity in their homes and payments made to Defendants toward the inflated balances.

119. Defendants' violations were willful. Defendants knew at the time they sent correspondence to Plaintiff and the putative class claiming that they owed interest going back years that the loans had been set to 0% interest by the prior servicer and owner of the loans, meaning those amounts were waived and could not be collected. Indeed, SLS's own onboarding files indicate the interest rate at the time of onboarding, which could be easily looked up by Defendants to confirm whether the interest was collectable. Defendants instead chose to assess interest for periods in which they knew the rate was 0% for their pecuniary gain, as the additional amounts would increase their own profits.

120. Plaintiffs and the putative class members are thus entitled to, at a minimum, either: (1) their actual damages or $500, whichever is greater, if Defendants' conduct was not willful; or (2) three times their actual damages or $1,000, whichever is greater, if Defendants' conduct was willful. Va. Code § 59.1-204.

121. Plaintiffs and the putative class are also entitled to their attorneys' fees and costs in prosecuting this action under Va. Code § 59.1-204.

122. And Plaintiffs and the putative class are entitled to injunctive relief enjoining the ongoing collection of the disputed interest under Va. Code §§ 59.1-203(C) and 59.1-205.

## COUNT FOUR:
## Declaratory Judgment Under 28 U.S.C. § 2201
## (Class Claim against All Defendants)

123. Plaintiff incorporates the preceding allegations as if fully set forth herein.

124. Under Federal Rule of Civil Procedure 23, Plaintiff brings this action for herself and on behalf of the following class of which she is a member against Shellpoint (the "Declaratory Judgment Class"):

> All consumers: (1) with an open- or closed-end mortgage serviced by SLS prior to SLS's merger with Shellpoint, (2) which SLS's and/or Shellpoint's records indicate at the time of onboarding of the loan had an interest rate of 0%; (3) and from whom Shellpoint is attempting to collect interest for periods when the interest rate was set at 0%.

125. Under Federal Rule of Civil Procedure 23, Plaintiff brings this action for herself and on behalf of the following subclass of which she is a member against both Defendants (the "Gulf Harbour Declaratory Judgment Class"):

> All consumers: (1) with an open- or closed-end mortgage owned by Gulf Harbour and serviced by SLS prior to SLS's merger with Shellpoint, (2) which SLS's and/or Shellpoint's records indicate at the time of onboarding of the loan had an interest rate of 0%; (3) and from whom Shellpoint and/or Gulf Harbour are attempting to collect interest for periods when the interest rate was set at 0%.

126. **<u>Numerosity</u>. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. Upon information and belief, SLS/Shellpoint services thousands of discharged mortgages and subjects all of them to the same procedures for the assessment of retroactive interest. The class members' names and addresses are identifiable through Defendants' and SLS's internal business records, and they may be notified of this litigation by published or mailed notice.

127. **<u>Predominance of Common Questions of Law and Fact</u>. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Plaintiff and the putative class members are subject to ongoing harm absent a declaratory

judgment; and (2) whether Plaintiff and the putative class members are entitled to a declaratory judgment that they do not owe interest and fees for periods in which the interest rate of the loan was set to 0%; and (3) the appropriate scope of the declaratory judgment.

128. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. She is also entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

129. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4)**. Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the class members that she seeks to represent. Plaintiff has retained counsel competent and experienced in class-action litigation, and they intend to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the putative class members' interests. Neither Plaintiff nor her counsel have any interests that might cause them to not vigorously pursue this action.

130. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be almost impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the courts. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by SLS/Shellpoint's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and

the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

131. Because the Plaintiff and putative class members were the subject of collection effort that included interest and fees that the Plaintiff and putative class members did not owe, Defendants are attempting to collect more money than is due under the Plaintiff's and putative class members' loans.

132. Plaintiff and members of the class are subject to ongoing harm absent a declaration that interest and fees are waived and/or unenforceable, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

133. The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the loan contracts as well as the validity, if any, of the disputed interest and fees,

134. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the ongoing attempted imposition of the interest and fees.

135. Accordingly, Plaintiff seeks a declaratory judgment that all interest and fees assessed for periods in which the interest rate on the loans was set to 0% are waived and/or unenforceable.

**COUNT FIVE:**
**Violation of RESPA, 12 U.S.C. § 2605(e)(2)**
**(Individual Claim against Shellpoint)**

136. Plaintiff incorporates the preceding allegations as if fully set forth herein.

137. As alleged above, Plaintiff submitted a QWR to Shellpoint, which Shellpoint received.

138. The mortgage obligation at issue is a "federally related mortgage loan" under RESPA, 12 U.S.C. § 2602(1), in that it is secured by a subordinate lien on residential real property designed for the occupancy of one to four families and the proceeds of it were used to purchase the secured property, and it was made by a lender whose deposits and accounts are insured by the FDIC and who is regulated by the Office of the Comptroller of the Currency.

139. Plaintiff was a borrower of the subject mortgage and Shellpoint and its predecessor in interest SLS were the servicers of the mortgage in accordance with 12 U.S.C. § 2605(e).

140. Plaintiff's letters were sent to the address designated by SLS and Shellpoint for requests for information.

141. Shellpoint violated 12 U.S.C. § 2605(e)(2) by failing to make appropriate corrections to Plaintiff's account in response to their Qualified Written Request, including removal of the improper interest.

142. Shellpoint also did not conduct a reasonable investigation in response to the Plaintiff's QWR.

143. Had a reasonable investigation occurred, Shellpoint would have discovered that no interest could lawfully accrue on the loans because the prior servicer and owner of the loans had set the interest rate at 0%.

144. Shellpoint further violated 12 U.S.C. § 2605(e)(2) by failing to provide Plaintiff with most of the information she requested or to explain why the requested information was unavailable.

145. Plaintiff's March 2025 letter constituted a request for information under 12 C.F.R. § 1024.35 in that Plaintiff asked Shellpoint/SLS to provide her with information about the servicing of her loan.

146. Despite this, SLS did not provide Plaintiff with her servicing notes, a full account history, or the onboarding information for her loan.

147. Because of Shellpoint's conduct, Plaintiff suffered concrete and particularized harm, including: informational injury and emotional distress, and the continued inability to access the excess equity in her home because Shellpoint has refused to remove the inflated interest charges, thus subjecting the equity to ongoing dispute and attempted collection.

148. Upon information and belief, discovery will reveal that Shellpoint's noncompliance with 12 U.S.C. § 2605(e)(2) is part of a pattern or practice of noncompliance with this provision.

149. Shellpoint and its predecessor SLS have been sued multiple times for failing to properly respond to QWRs, including for failing to provide requested information.

150. In addition, the CFPB's consumer complaint portal shows that 8,771 mortgage-related complaints have been filed against SLS as of October 30, 2025, including 136 complaints for failing to investigate an existing problem.

151. As of the same date, Shellpoint had 15,720 mortgage-related complaints filed with the CFPB, including 288 complaints for failing to investigate an existing problem.

152. Plaintiff is thus entitled to recover her actual damages, statutory damages, costs, and attorneys' fees from Shellpoint for each of its violations of 12 U.S.C. § 2605(e)(2) under 12 U.S.C. § 2605(f).

WHEREFORE, Plaintiff respectfully requests her actual, treble, and statutory damages; injunctive relief; attorneys' fees and costs; pre- and post-judgment interest at the legal rate; and any other relief that the Court finds appropriate.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Respectfully submitted,
**PLAINTIFF**

By:____*/s/ Kristi C. Kelly*_____________

Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
J. Patrick McNichol, VSB #92699
Matthew G. Rosendahl, VSB #93738
**KELLY GUZZO, PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
Email: pat@kellyguzzo.com
Email: matt@kellyguzzo.com

*Counsel for Plaintiff*